IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DON FOUST,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br><br>LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>　　　　　　Defendant. | ORDER AND<br>MEMORANDUM OF DECISION<br><br><br>Case No. 2:17-cv-01208-TC |

　　　　In 2014, Plaintiff Don Foust started experiencing serious back problems.  His insurer, Defendant Lincoln National Life Insurance Company, began paying Mr. Foust long-term disability benefits ("LTD benefits").  Two years later, Lincoln stopped paying LTD benefits.  Lincoln also denied Mr. Foust's request to waive his life insurance premiums (a benefit known as "life waiver of premiums" or "LWOP").  After twice appealing those decisions internally, Mr. Foust filed this lawsuit to compel Lincoln to provide LWOP benefits and further LTD benefits.

　　　　Mr. Foust and Lincoln each filed a cross-motion for summary judgment.  (ECF No. 40, 41.)  Because the court concludes Lincoln's decision to deny LWOP and LTD benefits was arbitrary and capricious, Mr. Foust's motion is granted, and Lincoln's motion is denied.

## I. ADMINISTRATIVE RECORD

### A. Mr. Foust Stops Working and Undergoes Surgery

Mr. Foust suffered a serious spinal injury in his youth and, as a result, had ongoing back problems as an adult. (Administrative Record (AR) 397, 1986, 1989.) Beginning in June 2014, his condition worsened. After recording that Mr. Foust was experiencing chronic pain and weakness, Dr. Arlan Henrie diagnosed Mr. Foust with "severe stenosis and myelomalacia." (AR 1497, 1502.) On June 18, Dr. Angelo Pugliano, Mr. Foust's primary physician, recorded that Mr. Foust was in significant pain. (AR 1503-04.) But on July 10, Mr. Foust obtained a neurosurgical review from Dr. Andrew Dailey, who concluded the problem was not yet severe enough to require surgery. (AR 1511.)

Mr. Foust, an engineer for DriverTech, Inc., stopped working on August 12, 2014. (AR 095.)

On August 29, Dr. Pugliano recorded that Mr. Foust was experiencing progressively longer and more severe headaches; that his hands were numb; and that vertigo was limiting his ability to walk. (AR 1513-14.) Dr. Pugliano reported this information to Lincoln in an Attending Physician Statement. When asked, "Date you believe patient was unable to work?" Dr. Pugliano wrote August 12, 2014. When asked "When do you think your patient will be able to return to work?" Dr. Pugliano wrote that Mr. Foust would "never" return to his previous job, and that it was "unknown" whether he would ever be able to work at any other job. (AR 1279.)

On September 12, Lincoln approved Mr. Foust's request for short-term disability benefits. (AR 1279.) On November 17, Lincoln informed Mr. Foust that, effective November 14, 2014, his short-term benefits would transition to LTD benefits. (AR 052.)

In September,[1] Dr. Dailey, Mr. Foust's surgeon, completed a disability form for Lincoln that included contradictory statements. Dr. Dailey indicated on one page that Mr. Foust was fit for "only sedentary work." But on the next page, Dr. Dailey indicated that Mr. Foust was incapable of even "minimum sedentary activity." (AR 1296.) On March 12, 2015, Lincoln discovered this apparent discrepancy and noted that Dr. Dailey needed to be contacted for clarification. But it does not appear any contact occurred at that time. (AR 1305.) In May, Lincoln asked a nurse, Fil Castillo, to review the file. He tried to call Dr. Dailey on May 11, May 15, and May 18, to discuss the issue, but did not reach him. (AR 1310.)

On April 1, the Social Security Administration (SSA) told Mr. Foust that he had been awarded Social Security Disability Income (SSDI) effective January 2015. (AR 535.) The SSA also concluded that Mr. Foust had become disabled in July 2014. (AR 535.)

On April 23, Mr. Foust underwent surgery to try to repair his back. (AR 1038.) At two follow-up visits on May 20 and July 28, Dr. Dailey indicated the surgery had led to significant improvements for Mr. Foust. (AR 1046, 1048.)

B. Lincoln Denies LWOP Benefits and Mr. Foust Appeals

On June 9, 2015, Lincoln told Mr. Foust that he was ineligible for LWOP benefits because he could have worked part-time in a sedentary job in the six months after he left his job (meaning between August 12, 2014, and February 12, 2015). (AR 1925-28.)

On November 4, Mr. Foust filed an appeal of the denial of LWOP benefits. (AR 1471.)

Lincoln then retained Dr. Jacqueline Hess to review Mr. Foust's file. Dr. Hess concluded that from August 12, 2014, to September 24, 2014, Mr. Foust could have worked at a sedentary

---

[1] The form was either completed on September 4, 2014 (AR 1310) or September 24, 2014 (AR 1296).

level.  She concluded that from September 24, 2014, to October 4, 2015, Mr. Foust was unable to function in any capacity.  And she concluded that from October 4, 2015 onward, Mr. Foust could again function at a sedentary level.  (AR 920.)

Dr. Hess also called Dr. Dailey to discuss Mr. Foust's status and recorded that Dr. Dailey "agreed that the claimant was capable of sedentary work activities as of 10/4/15." (AR 930.)  Dr. Dailey confirmed by letter that this was an accurate summary of their conversation.  (AR 931.)

On December 21, 2015, Lincoln upheld its denial of the LWOP benefits.  (AR 381-85.)

C.  Lincoln Stops Providing LTD Benefits

On January 11, 2016, Nurse Jennifer Scarborough reviewed Mr. Foust's records for Lincoln.  She wrote, "I am in agreement with [Dr. Dailey] that the claimant would be limited from performing any greater than sedentary level activities." (AR 037.)  On March 18, Ms. Brandy Thomas, M.A., C.R.C., conducted a transferable skills assessment of Mr. Foust on Lincoln's behalf.  She concluded Mr. Foust was "able to function in a sedentary capacity, with functional limitations include no lifting, carrying, pulling or pushing over 10 pounds.  Dr. Jacqueline Hess does not indicate any additional restrictions or limitations." (AR 906.)  Based on Mr. Foust's educational background and training, Ms. Thomas identified three potential sedentary jobs for Mr. Foust: project director, specification writer, or consultant.  (AR 906.)

On April 6, Lincoln wrote Mr. Foust and informed him that they had preliminarily concluded that he was capable of sedentary work, so they would be ending his LTD benefits. Lincoln gave Mr. Foust 45 days to provide medical records that challenged this determination. On June 2, having received no additional records, Lincoln informed Mr. Foust that his LTD benefits would be discontinued beginning November 11, 2016.  (AR 516-17.)

D.  Mr. Foust's Condition Worsens

Throughout the first half of 2016, Mr. Foust repeatedly met with Dr. Rajiv Shah, who treated him with steroid injections, lumbar medial branch blocks, and lumbar radiofrequency rhizotomies.  In each instance, Dr. Shah indicated that the procedures were necessary because Mr. Foust was "experiencing a significant flare-up of [his] baseline pain which is not controlled with the current regimen or treatment plan."  (AR 0447-49, 457, 474, 489, 493-96.)

On July 20, 2016, Dr. Dailey completed a new assessment of Mr. Foust.  He wrote:

[Mr. Foust] continues to have difficulty with right arm symptoms. . . .  On his myelopathy testing there is worsening of his times on the pegboard. . . .  His 10-meter walk has increased in time too, and his grip strength is tremendously different. . . .  At this stage, I think it would be very hard for [Mr. Foust] to work given his weakness that is progressing.

(AR 390.)

On August 6, 2016, Ms. Dina Galli, M.Ed., L.V.R.C., C.R.C., C.C.M., conducted a vocational examination with Mr. Foust.  In her report, Ms. Galli wrote:

With respect to his cervical myelopathy, both Dr. Hess and Dr. Dailey indicate Mr. Foust is capable of Sedentary exertion as of 12/2015.  From a vocational stand point, that is not the same as a finding of being capable of sustained Sedentary employment. . . .  [They did not] address non-exertional aspects of Sedentary work (reaching, handling, fingering, sustained sitting, memory, concentration, vision, persistence, pace, attendance, etc.). . . .  My review of the record is not consistent with Mr. Foust having reached a point of medical stability or functional improvement at any point since his leaving work in 2014 sufficient to allow for reentrance into the work force at any exertional level.

(AR 400.)  In particular, Ms. Galli was concerned Mr. Foust would not be able to obtain a job given his difficulty typing or engaging in other tasks requiring fine motor skills.  (See AR 401 ("Given his dominant arm/hand complaints diagnosed as CRPS by Dr. Hutchinson 12/07/2015, as well as the pegboard and grip testing performed by Dr. Daily (sic) on 07/20/16 . . . it is my

opinion that the occupational base available to Mr. Foust has been substantially reduced in relation to manipulative limitations alone.").)

Ms. Galli also warned that Mr. Foust would not be able to attend work on a regular basis, and that when he did attend, he would be unfocused:

> Mr. Foust is reporting multiple days a week when his headaches and other symptoms are so severe that he is doing nothing other than eating and toileting. Dr. Daily (sic) has specifically opined that Mr. Foust would miss work three times a week.[2] . . . An absentee rate of multiple days weekly (or even monthly) would clearly fall outside of even the most generous of employer paid or unpaid sick leave policies.
>
> Other basic work activities include the ability to concentrate and focus sufficiently to perform the essential elements of the work, to work at a consistent pace, [to] get to and stay at the work site for prescribed periods, to achieve expected productivity and accuracy standards, and to interact appropriately with supervisors and peers. Dr. Daily (sic) addresses these non-exertional limitations in his "Assessment of Restrictions" report noting deficits in concentration, need for additional rest period, need to lie down during the workday, etc. . . .

(AR 401.) Based on all these issues, Ms. Galli concluded "that Mr. Foust has been and continues to be incapable of gainful employment of any kind." (AR 402.)

On August 16, 2016, Dr. Dailey completed an Assessment of Restrictions for Purposes of Determining Disability. It states that in a full-time job, Mr. Foust would be able to sit or stand for only 15-20 minutes at a time, and that Mr. Foust could "occasionally" lift 1-5 pounds, "infrequently" lift 5-10 pounds, and "never" lift anything greater. (AR 392.) Dr. Dailey reported that, in a typical workday, Mr. Foust would require bedrest twice a day for 30 to 60 minutes, and that he would need to take a one-hour break for every two-to-three hours of work.

---

[2] This is evidently a reference to an Assessment of Restrictions by Dr. Dailey (AR 392), which is discussed next. The Assessment of Restrictions is dated August 16, 2016, while Ms. Galli's report is dated August 6, 2016, but she evidently already had access to the Assessment of Restrictions at the time of her report, as she references it twice.

Dr. Dailey warned that Mr. Foust would be expected to have "lapses in concentration or memory . . . for several hours per day" while at work, and that Mr. Foust would "constantly" struggle with fine manipulation, typing, writing, and grasping small objects.  Finally, when asked "Please estimate, to the best of your ability and expertise, how many absences could be reasonably medically expected in any week," Dr. Dailey wrote "3x/week if he is lucky."  (AR 393-94.)

    E.   <u>Mr. Foust Appeals the LTD Benefits Denial for the First Time, and Appeals the LWOP Denial for the Second Time</u>

On August 16, 2016, Mr. Foust appealed, for the second time, the denial of his LWOP benefits.  (AR 1379.)  On September 12, Lincoln again denied the appeal.  (AR 1363.)

On September 14, Nurse Lynn Sucha conducted a review of Mr. Foust's file for Lincoln.  As others had done, she noted that the apparent discrepancy in Dr. Dailey's first disability form, where he simultaneously indicated Mr. Foust was capable and incapable of sedentary work.  (AR 1295-96.)  The record does not disclose whether she made any effort to follow up on this issue.

Throughout the fall of 2016, Mr. Foust continued to obtain treatments from Dr. Shah for his pain.  (AR 148-170, 837, 846.)

On November 29, 2016, Mr. Foust appealed the denial of his LTD benefits.  (AR 521.)

Lincoln asked Dr. Richard Kaplan to review Mr. Foust's records for the appeal.  In preparation, Dr. Kaplan attempted to call Dr. Dailey and Dr. Shah on December 19, 20, and 21, but was unable to reach either of them.  (AR 205.)  On December 23, 2016, Dr. Kaplan completed his review of Mr. Foust's records.  Dr. Kaplan concluded:

> I would estimate that the patient would be limited to standing or walking for 20 minutes continuously or one hour cumulatively per day.  He could sit for an unlimited period of time, except for changes in position for one minute each hour.  He should avoid kneeling, climbing, balancing, or working at heights or operating dangerous equipment. . . .  He could lift or carry 5 pounds frequently or 10 pounds

occasionally. . . .  These restrictions would be in effect from 11/11/2016 indefinitely into the future; I would recommend reassessment on an annual basis.

(AR 206.)

Regarding the claim that Mr. Foust struggled with fine motor skills, Dr. Kaplan wrote, "[r]eports of difficulty with dexterity . . . appear to be largely subjective by patient report, but not confirmed objectively on neurological examination or objective functional testing." (AR 205.) Dr. Kaplan also warned that it was possible Mr. Foust's opioid medication could cause "cognitive impairment." But Dr. Kaplan concluded that if these medications had side effects, Mr. Foust could simply stop taking them, as they were not medically necessary. (AR 206.)

On January 10, 2017, Ms. Stacey Nidositko, M.S., C.R.C., completed a vocation review for Lincoln. She was asked whether the three occupations previously identified by Ms. Thomas—project director, specification writer, or consultant—remained viable options for Mr. Foust. She concluded they were. (AR 013-14.) She was then asked to review Ms. Galli's vocational report. She found there was "no indication that there is disagreement [in Ms. Galli's report] with the occupations identified from a skills standpoint perspective." (AR 014.) Lincoln questioned this conclusion, noting that Ms. Galli's report indicated Mr. Foust was "incapable of gainful employment of any kind." Ms. Nidositko reiterated that, regardless of Ms. Galli's conclusion, her vocational exam had not, "from a skills standpoint perspective," shown that Mr. Foust could not perform the identified jobs. (AR 014.)

On January 11, 2017, Mr. Foust's appeal of his LTD benefits was denied. (AR 231-235.)

F.  Mr. Foust Appeals the Denial of LTD Benefits Again

Mr. Foust then asked Mr. Mark Anderson, P.T., M.P.T., O.C.S., to conduct a three-hour functional capacity evaluation. Mr. Anderson concluded:

> The objective results indicated that Mr. Foust is able to work/function only at a below-sedentary physical demand level for up to 3 hours (occasional) during an 8-hour day, with the remainder of his day spent below this physical demand level, or that he could not perform sustained work beyond a total of 3 hours during one continuous day.

(AR 211.)  Regarding sitting in one position for long periods of time, Mr. Anderson indicated

Mr. Foust would need a break every thirty minutes.  Regarding fingering, Mr. Anderson noted,

"Looking down in seated position tolerated but with poor performance, looking down from

standing caused severe symptoms."  (AR 214.)

On July 10, 2017, Mr. Foust submitted Mr. Anderson's report to Lincoln as part of his

second appeal of the denial of LTD benefits.  (AR 224.)

Dr. Eric Kerstman then reviewed Mr. Foust's records.  Dr. Kerstman indicated that he

had been unable to reach Dr. Dailey, but that he had spoken with Dr. Dailey's nurse practitioner,

Nurse Daniel Hovey, who relayed that Mr. Foust "has permanent sedentary work restrictions

from a neurosurgical perspective."  (AR 110.)  Dr. Kerstman also spoke with Dr. Shah, who

summarized Mr. Foust's medical history, including the fact that, although much of his pain had

been remedied, Mr. Foust still had "persistent numbness of the right hand."  Additionally, Dr.

Kerstman recorded that in Dr. Shah's opinion "the claimant's maximum work capacity is

sedentary level work."  (AR 110-11.)  Finally, Dr. Kerstman spoke with Mr. Anderson, who

indicated Mr. Foust had a "maximum capacity of occasional sitting, standing, walking, bending,

and reaching, and no kneeling and crouching."  (AR 111.)

Dr. Kerstman identified the following permanent limitations for Mr. Foust: "Lifting,

carrying, pushing, and pulling a maximum of 10 pounds occasionally.  Occasional standing and

walking.  Occasional bending, kneeling, and squatting.  Occasional use of the upper extremities

to perform grasping, handling, fingering, and typing.  No exposure to unprotected heights." (AR 111-12.)  Based on these limitations, Dr. Kerstman concluded Mr. Foust could work at a sedentary level.  (AR 113.)

Lincoln informed Mr. Foust of Dr. Kerstman's conclusions and provided Mr. Foust an opportunity to respond.  On September 13, Ms. Galli completed a supplemental vocational report, which was then conveyed to Lincoln.  She warned:

> [I]ndividuals that are limited to predominantly seated work activities and also limited to only occasional reaching, handling, and fingering are unemployable in the competitive labor market in any capacity. . . .  It is my opinion that the more recent records of Mr. Anderson and Dr. Kerstman serve only to bolster the opinions set forth in my previous report.

(AR 129 (emphasis in original).)

On September 27, Lincoln asked Ms. Heili S. Randall, A.B.D., M.A., C.R.C., to conduct a vocational review of Mr. Foust's file.  Ms. Randall concluded that Mr. Foust could work as an engineering drawings checker, specification writer, or consultant.  (AR 121.)

On October 3, 2017, Lincoln denied Mr. Foust's second LTD benefits appeal.  (AR 114.)  Mr. Foust then brought this action under 29 U.S.C. § 1132.

## II.  STANDARD OF REVIEW

A court reviews claims under 29 U.S.C. § 1132(a)(1)(B) de novo unless the underlying benefit plan gives the claim administrator "discretionary authority to determine eligibility benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the plan creates discretionary authority, the court uses the arbitrary and

capricious standard.[3]  Id.; see also Flinders v. Workforce Stabilization Plan of Phillips Petrol. Co., 491 F.3d 1180, 1189 (10th Cir. 2007), abrogated on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008).  The arbitrary and capricious standard of review is deferential:  A decision to deny benefits "will be upheld so long as it is predicated on a reasoned basis." Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006).  "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one."  Id.

Under the arbitrary and capricious standard of review, the court considers both the terms of the plan and the evidence in the record.  The court must determine whether the plan administrator's interpretation of the plan was "reasonable and made in good faith."  Hickman v. GEM Ins. Co., 299 F.3d 1208, 1213 (10th Cir. 2002).  The court must also ensure that substantial evidence supports the denial of benefits.  Graham v. Hartford Life & Accident Ins. Co., 589 F.3d 1345, 1358 (10th Cir. 2009).  "Substantial evidence" means "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker."  Id.

Lincoln argues the court should apply the arbitrary and capricious standard because the text of the relevant insurance policies provides it with discretion in awarding or denying benefits. (AR 068, 1342, 2384.)  Mr. Foust responds that, because of irregularities in the processing of his claim, the court should review Lincoln's decision de novo.  See, e.g., Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1316 (10th Cir. 2009) (holding that courts apply de novo review, even if the plan provides discretion, if the defendant did not substantially comply with ERISA regulations).  Because the court concludes, for the reasons below, that Mr. Foust prevails

---

[3] The Tenth Circuit, in reviewing ERISA cases, uses the terms "abuse of discretion" and "arbitrary and capricious" interchangeably.  See Weber v. GE Group Life Assurance Co., 541 F.3d 1002, 1010 n.10 (10th Cir. 2008).

on his claim even under the more exacting arbitrary and capricious standard, the court does not address whether it would be more appropriate, on the facts here, to review the claim de novo.

## III. ANALYSIS

### A. LWOP Benefits

Under Mr. Foust's life insurance policy, Lincoln agreed to continue to provide Mr. Foust life insurance, without requiring that he pay any premiums, if:

1. He became "Totally Disabled;"

2. He remained totally disabled for six months; and

3. He submitted proof of his total disability within twelve months of becoming disabled.

(AR 1333.)

"Total Disabled" means that Mr. Foust was "unable, due to sickness or injury, to engage in any employment or occupation for which [Mr. Foust] is or becomes qualified by reason of education, training, or experience." (AR 1333.) Accordingly, in order to qualify for LWOP benefits, Mr. Foust had to be unable to work at any job between August 12, 2014 (his last day of work) through at least the next six months, to February 12, 2015.

In its letter denying Mr. Foust's second appeal, Lincoln wrote, "from [Mr. Foust's] date of disability of 8/12/2014 to his surgery date [4/23/2015], he did not have restrictions or limitations that would have prevented him from performing sedentary duties on at least a part-time basis." (AR 1363.) This statement is directly contradicted by Lincoln's own reviewer. Dr. Hess, the first of three doctors to review Mr. Foust's medical records on Lincoln's behalf, concluded that "for the time period between 9/24/14 and 10/4/15 . . . the claimant was unable to function reliably in any capacity." (AR 920.) Neither Dr. Kaplan nor Dr. Kerstman, the other

Lincoln reviewers, addressed this time period in their reports, as they were focused solely on Mr. Foust's post-November 2016 condition. (AR 108-113, 199-207.) No evidence contradicts Dr. Hess's conclusion that for seven of those first eight-and-a-half months, Mr. Foust could not "function reliably in any capacity." Mr. Foust was clearly totally disabled for that period.

The only question, then, is whether Mr. Foust would also be considered totally disabled for the period immediately following his departure from work, between August 12, 2014, and September 24, 2014. Dr. Hess believed that, during this period, Mr. Foust would have been able to work at a sedentary job. (AR 924.) But her conclusion is not supported by the record. On August 29, 2014, Dr. Pugliano completed an Attending Physician Statement, in which he stated that, in his view, Mr. Foust was no longer able to continue working as of August 12, 2014, and that it was unknown when, if ever, he would be able to work again. (AR 1279.) Dr. Hess never addresses this document. On the contrary, she states that "Dr. Pugliano makes no statement regarding the claimant's functional capacity. Therefore, he was not contacted." (AR 924.) But given Dr. Pugliano's August 29, 2014 conclusions, Dr. Hess's statement was incorrect.

Moreover, in September 2014, Dr. Dailey completed a disability form that asserted both that Mr. Foust was capable of sedentary work and that Mr. Foust was incapable of any work. Lincoln's records note this discrepancy at least twice in the period before Dr. Hess conducted her review. (See AR 1305, 1310.) But Dr. Hess did not raise the issue with Dr. Dailey when she spoke to him. Instead, Dr. Hess's summary of her communications with Dr. Dailey refer solely to Mr. Foust's post-October 2015 condition. (AR 927.) Again, this suggests Dr. Hess's report was simply incomplete.

After Dr. Hess completed her report, Ms. Galli's vocational exam further bolstered Mr. Foust's claim.  Ms. Galli wrote, "My review of the record is not consistent with Mr. Foust having reached a point of medical stability or functional improvement at <u>any point</u> since his leaving work in 2014 sufficient to allow for reentrance into the work force at <u>any</u> exertional level."  (AR 400 (emphasis added).)  As noted, when Dr. Kaplan and Dr. Kerstman reviewed Ms. Galli's report, they did not address its conclusions regarding Mr. Foust's condition in 2014.  (AR 108-113, 199-207.)  When Ms. Nidositko reviewed Ms. Galli's assessment, she also focused only on its post-November 2016 conclusions.  (AR 013-14.)  Aside from Ms. Galli's vocational exam, no later evidence addresses the relevant time period.

In sum, when Lincoln first denied Mr. Foust's request for LWOP benefits in June 2015, Lincoln had only two pieces of evidence to consider: Dr. Pugliano's conclusion that Mr. Foust was totally disabled; and Dr. Dailey's contradictory report that Mr. Foust could or could not perform sedentary work, a contradiction Lincoln had flagged but not resolved.  When Lincoln denied Mr. Foust's first appeal, it had received a third piece of evidence: Dr. Hess's report, in which Dr. Hess failed to speak to Dr. Pugliano at all and failed to ask Dr. Dailey about his view of Mr. Foust's pre-September 2014 condition.  Finally, when it denied Mr. Foust's second appeal, the only additional evidence it had received was Ms. Galli's unrebutted report that Mr. Foust had been unable to work in any capacity beginning the day he left his job.[4]

---

[4] Mr. Foust argues a fifth piece of evidence also exists: The SSA awarded him SSDI based on its conclusion that his disability began July 17, 2014.  (AR 535.)  The court agrees that this bolsters Mr. Foust's case, but it is not determinative.  See Broadhead v. Fed. Express Corp., No. 2:05-CV-806, 2007 WL 951544 at *10 (D. Utah Mar. 26, 2007) ("In regards to Social Security benefits, the Tenth Circuit noted that although Social Security determinations may be considered by an administrator as persuasive evidence they are not binding. Instead, Social Security determinations 'are entirely different and separate from a claim under ERISA, with different parties, different evidentiary standards, and different bodies of law governing their outcomes.'" (quoting Wagner–Hardin v. Farmland Indus., 26 F. App'x 811, 817 (10th Cir. 2001)).

In Rekstad v. U.S. Bancorp, 451 F.3d 1114 (10th Cir. 2006), a plan administrator reviewed records submitted by various medical professionals, but disregarded any affidavits submitted by non-medical professionals. The Tenth Circuit concluded that denying disability benefits based on this review was arbitrary and capricious because the administrator failed to consider all the evidence before it. Id. at 1120-21. Similarly, here, no one ever considered Dr. Pugliano's conclusion that Mr. Foust was unable to work beginning August 12, 2014. None of Lincoln's reviewers addressed Ms. Galli's conclusion that Mr. Foust was unable to work as of August 2014. No one ever obtained from Dr. Dailey an explanation for why he simultaneously said Mr. Foust could and could not work, even though Dr. Hess had the opportunity to do so while speaking to him about Mr. Foust's condition. This is not a case in which Lincoln disagreed with certain medical evidence in favor of other medical evidence. Rather, as far as the record discloses, Lincoln simply ignored evidence that was inconvenient to its conclusion.

Because Lincoln failed to consider these records, the court concludes Lincoln's denial of LWOP benefits was arbitrary and capricious.[5]

B. LTD Benefits

Mr. Foust was entitled to LTD benefits if he became "totally disabled" while covered by the insurance plan.[6] (AR 075.) These benefits would cease on the earliest of:

---

[5] Lincoln argues that, even if Mr. Foust was totally disabled initially, he was no longer totally disabled as of October 4, 2015, and is not entitled to further LWOP benefits as of that date. Both Dr. Hess and Dr. Dailey concluded that Mr. Foust was able to engage in sedentary work as of October 4, 2015, though Ms. Galli disagreed. Given this conflicting evidence, the court agrees it would be within Lincoln's discretion to deny LWOP benefits effective October 4, 2015. But for the reasons stated in the next section, the court also concludes that by July 2016, Mr. Foust's condition had so deteriorated that he was once again totally disabled. Because the parties do not brief what occurs to Mr. Foust's LWOP benefits, under the plan, if he is totally disabled for fourteen months, then capable of sedentary work for eight months, and then once again totally disabled, the court does not address that issue.

[6] Mr. Foust also had to satisfy other requirements, such as that he be under the regular care of a physician, and that he submit proof of the disability at his own expense. (AR 075.) There is no dispute he satisfied these requirements.

1. the date Mr. Foust "ceases to be Totally Disabled or dies;"

2. the date the maximum benefit period ends; or

3. the date Mr. Foust "is able but chooses not to engage in Partial Disability Employment."

(AR 075.)

"Partial Disability Employment" is defined as being able to work at your own job (with reasonable accommodations if necessary) in the 27 months after becoming disabled, or being able to work at any job, considering your training, education, and experience (with accommodations if necessary), after those initial 27 months. (AR 003, 062.) Mr. Foust received disability benefits for the duration of the initial 27-month period. (AR 052, 1279.) Accordingly, whether Mr. Foust is entitled to further LTD benefits depends on whether Mr. Foust was able, beginning November 11, 2016, to work at any job.

Significant evidence submitted by Mr. Foust indicates he was unable to do so. Although Mr. Foust's condition had improved after surgery in 2015, by mid-2016, it had worsened considerably. For example, Dr. Dailey's July 20, 2016, assessment concluded "it would be very hard for [Mr. Foust] to work given his weakness that is progressing." (AR 390.) Dr. Dailey's August 16, 2016, assessment concluded Mr. Foust could only sit for 15 to 20 minutes at a time; that he would need bedrest twice a day for 30 to 60 minutes; that he would need a break of one hour for every two to three hours worked; that he would likely have "lapses in concentration or memory . . . daily for several hours per day;" that he would "constantly" struggle with fine manipulation, typing, writing, and grasping small objects; and that he would be "lucky" if he only had three medical absences per week. (AR 393-94.)

Ms. Galli's vocational exam warned that even if Mr. Foust were capable of the physical aspects of sedentary work (such as lifting up to 10 pounds occasionally), he was unable to do other things necessary for most sedentary jobs. (AR 400.) She believed he would be mostly unable to type, would be mostly unable to focus or complete specific tasks while at work, and would frequently miss work. (AR 401-02.) She concluded that "Mr. Foust has been and continues to be incapable of gainful employment of any kind." (AR 402.) After reviewing additional records, she completed a supplemental report that concluded "the more recent records . . . serve only to bolster the opinions set forth in my previous report." (AR 129.)

Finally, Mr. Anderson's functional capacity evaluation concluded Mr. Foust could work no more than three hours per day at a "below-sedentary physical demand level;" that he could sit for no more than thirty minutes at a time; and that typing while sitting "was tolerated but with poor performance." (AR 211-214.)

Each of these records strongly supports the conclusion that Mr. Foust was unable to work in any capacity after November 11, 2016. The question, then, is whether Lincoln had "more than a scintilla of [other] evidence that a reasonable mind could accept as sufficient" to justify concluding that Mr. Foust actually could work. See Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey, 663 F.3d 1124, 1133-34 (10th Cir. 2011).

Reviewing the records relied on by Lincoln, the court concludes Lincoln's decision lacked such support.[7]

---

[7] Mr. Foust's condition stabilized somewhat between October 2015 and July 2016, and then deteriorated. Because of this, evidence from before July 2016 is unhelpful in determining what Mr. Foust's status would be like after November 2016, and the court does not consider the report of Dr. Hess, the review by Nurse Scarborough, or the skills assessment by Ms. Thomas, all of which were written before Mr. Foust's condition worsened.

First, Dr. Kaplan does not address several issues in the records. Dr. Kaplan never discusses Dr. Dailey's conclusions that Mr. Foust would need bedrest twice a day and would be absent from work three times a week. Nor does he mention Ms. Galli's concerns about attendance. Instead, Dr. Kaplan focuses only on the amount of time Mr. Foust can walk, stand, or sit, and the amount of weight he can lift. (AR 205-06.)

To the extent he does disagree with their conclusions, rather than merely ignore them, his disagreement is generally not based on a legitimate review of the medical records. For example, Dr. Kaplan argues that concerns about Mr. Foust's ability to type "appear to be largely subjective by patient report, but not confirmed objectively on neurological examination or objective functional testing." (AR 205.) This is incorrect. Dr. Dailey's concerns about Mr. Foust's ability to type were based, at least in part, on objective testing: he was concerned because Mr. Foust performed so poorly on a "pegboard" test, which is described elsewhere in the records as an "objective measurement" and a form of "manual testing" of Mr. Foust's hand speed. (AR 2355, 2466, 2541, 2559.) Ms. Galli also expressed concern about Mr. Foust's typing based on objective tests. (See AR 401 (concluding Mr. Foust lacked employment opportunities due to "his dominant arm/hand complaints diagnosed as CRPS by Dr. Hutchinson 12/07/2015, as well as the pegboard and grip testing performed by [Dr. Dailey].") Dr. Kaplan does not explain why, given these tests, he concluded the concerns were subjective rather than objective.

Similarly, Dr. Dailey and Ms. Galli warn that Mr. Foust is likely to struggle with memory and concentration while at work. Dr. Kaplan addresses these concerns only in the context of opioids, writing that although he did not believe the medication prescribed to Mr. Foust had caused cognitive defects, Mr. Foust could simply stop taking them if they had. (AR 206.) But

Dr. Dailey and Ms. Galli's concerns were not solely due to medication: they also blamed his pain and other symptoms.[8]  Again, Dr. Kaplan's report mostly ignores this aspect of the record.

Ms. Nidositko, who was asked to review Ms. Galli's vocational exam, also fails to address the substance of Ms. Galli's conclusions.  Ms. Nidositko indicated that "from a skills standpoint perspective," Ms. Galli's exam showed that Mr. Foust could work in sedentary jobs.  (AR 13-14.)  This conclusion makes sense only if things like attendance, memory, focus, and typing do not count as "skills" necessary for work.  (AR 13-14.)  As with Dr. Kaplan, Ms. Nidositko's review provides no substantive explanation for why she disagreed with Ms. Galli.  Rather, her response strongly suggests she simply disregarded portions of Ms. Galli's findings.

Finally, as with the other reviewers, Dr. Kerstman ignores key parts of Mr. Foust's records.  For example, Dr. Kerstman makes recommendations regarding how long Mr. Foust can stand or walk, and how much weight he can lift, but makes no recommendations regarding how long he can sit, even though Dr. Dailey and Mr. Anderson found Mr. Foust could only sit for between 15 and 30 minutes at one time.  (AR 111-12.)  This is a particularly egregious omission, because many courts have indicated that the amount of time a person can sit is a key inquiry in determining whether that person is fit for sedentary work.  See, e.g., Armani v. Northwestern Mut. Life Ins. Co., 840 F.3d 1159, 1163-64 (9th Cir. 2016) (collecting cases).  And Dr. Kerstman never addresses Dr. Dailey's conclusions that Mr. Foust would need bedrest twice a day or that Mr. Foust would require three medical absences from work each week, nor does he address Mr.

---

[8] When asked, "Is it reasonable that [Mr. Foust's] pain, medical condition or medication would cause lapses in concentration or memory," Dr. Dailey responded "Yes," without specifying whether the cause was pain, medical condition, or medication.  (AR 393.)  Given this ambiguity, Dr. Kaplan should have addressed all three potential causes, not just medication.  Ms. Galli, by contrast, does not mention Mr. Foust's medication, instead concluding that his headaches and vertigo, among other "severe" symptoms, would inhibit his ability to focus.  (AR 401.)

Anderson's conclusion that Mr. Foust would be able to work for no more than three hours a day. Dr. Kerstman never articulates the number of hours each day, or the number of days each week, that he believed Mr. Foust was capable of working. (AR 111-12.)

Additionally, because Dr. Kaplan indicated Mr. Foust lacked objective testing of his typing ability, Mr. Foust underwent further objective tests with Mr. Anderson regarding that issue. (AR 214.) Dr. Kerstman apparently found these tests persuasive, as he indicated in his report that Mr. Foust would only have "[o]ccasional use of the upper extremities to perform grasping, handling, fingering, and typing." (AR 111-12.) As Ms. Galli persuasively argued upon reviewing Dr. Kerstman's report, "individuals that are limited to predominantly seated work activities and also limited to only occasional reaching, handling, and fingering are unemployable in the competitive labor market in any capacity." (AR 129 (emphasis in original).) Ms. Randall, the only person to review Mr. Foust's records after Ms. Galli made this supplemental finding, neither acknowledges nor responds to this concern. (AR 121.)

In sum, even if it was reasonable for Lincoln to accept the more favorable conclusions made by its reviewers regarding the amount of time Mr. Foust could stand or lift weight, the unrebutted evidence from Dr. Dailey, Ms. Galli, and Mr. Anderson outweighs any finding that Mr. Foust was employable. Their conclusions indicate Mr. Foust was severely limited in the amount of time he could work each day and the number of days he could work each week. While at work, he could not sit for long periods of time and could type only occasionally, and he would frequently be unable to focus and would have memory lapses. Because Lincoln never explained why these findings either were incorrect or would not prevent Mr. Foust from working, Lincoln had no basis to discontinue Mr. Foust's LTD benefits.

The Tenth Circuit has been clear that insurance companies cannot simply ignore inconvenient evidence. See Rekstad, 451 F.3d at 1121 ("It was arbitrary for U.S. Bancorp to make its decision to deny disability benefits without it giving full and fair consideration to the affidavits submitted by Ms. Rekstad and her relatives. . . . Because U.S. Bancorp relied upon ITT's determination, wherein ITT did not consider this evidence, its decision was arbitrary."); Cf. Rasenack, 585 F.3d at (10th Cir. 2009) (holding, while applying a de novo standard of review, that AIG failed to conduct a "full and fair assessment" of the plaintiff's claims because "[c]omparing AIG's explanations of its decision to deny the claim to the information contained in the administrative record, it appears that AIG cherry-picked the information helpful to its decision to deny Mr. Rasenack's claim and disregarded the contrary opinions of the medical professionals who examined, treated, and interviewed Mr. Rasenack.").

Lincoln argues that its review of the record was analogous to the reviews conducted in Jennings v. Hartford Life and Accident Insurance Company, No. 2:15-cv-683-RJS-EJF, 2018 WL 1581264 (D. Utah March 29, 2018) and Miller v. Unum Life Insurance Company of America, No. 1:06CV00067, 2009 WL 722735 (D. Utah March 1, 2009), which were held to be sufficient under the arbitrary and capricious standard. In both cases, the plaintiffs argued the insurance companies had ignored evidence in their medical records, and in both cases, the court disagreed. But neither case suggests insurance companies are permitted to ignore the evidence before them; rather, both cases concluded the insurance companies had in fact considered all relevant evidence. See Jennings, 2018 WL 1581264 at *5 ("The fact that Hartford's decision is not in line with the conclusion drawn in [the physicians'] letters does not signify that it arbitrarily disregarded the physicians' opinions. Rather, as Hartford outlined in its explanation, it

considered the letters but found insufficient medical evidence to support [their] conclusion."); Miller, 2009 WL 722735 at *5 ("Unum did not 'cherry pick' which records to include. . . . Indeed, two Unum physicians . . . reviewed all medical records, employment information, and other documents compiled by Unum.")

The court here is conducting the same inquiry as the Jennings and Miller courts.  It simply reaches a different result based on a different record.  Lincoln (and its reviewers) did not address all of the evidence before it, so denying LTD benefits was arbitrary and capricious.

## IV.     REMEDY

In Rekstad, after concluding that the insurer had failed to fully consider the record, the Tenth Circuit ordered the matter returned to the insurer for reconsideration.  Rekstad, 451 F.3d at 1121.  The Tenth Circuit indicated this was the proper remedy when applying the arbitrary and capricious standard, unless the claimant's entitlement to benefits was "so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." Id. (quoting Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 477 (7th Cir. 1998)).

Regarding Mr. Foust's entitlement to LWOP benefits between August 12, 2014, and October 4, 2015, the court concludes the matter is so clear cut that Lincoln must be ordered to pay the benefits.  But whether Mr. Foust should obtain additional benefits beginning in July 2016 is returned to Lincoln for further review.

The court also concludes that "it would be unreasonable" for Lincoln to deny further LTD benefits "on any ground."  (Rekstad, 451 F.3d at 1121)  Mr. Foust's request for further LTD benefits is accordingly granted in full.

## V.      EFFECT OF SSDI PAYMENTS

Lincoln argues that under the insurance policy, Mr. Foust's LTD benefits are supposed to be reduced by the amount of SSDI he receives.  Lincoln argues Mr. Foust did not timely inform it of his SSDI benefits, leading to an overpayment of LTD benefits.  The parties dispute whether Mr. Foust has fully repaid this amount.  (See, e.g., AR 933 (letter from Lincoln demanding repayment of $14,264.91); AR 1071 (letter from Lincoln indicating they would begin reducing the amount of his LTD benefits based on his receipt of SSDI benefits).)

In its motion, Lincoln states, "To the extent the Court denies Lincoln's Motion for Summary Judgment, Lincoln is entitled to offset the amount of benefits overpaid to Plaintiff as a result of SSDI payments and reserves the right to brief the Court on the amount of benefits due to Plaintiff."  (ECF No. 40 at 27 n.10.)

The court agrees that, to the extent the parties are unable to resolve this dispute without court intervention, Lincoln may file a motion regarding this issue.

## ORDER

Lincoln's motion for summary judgment (ECF No. 40) is DENIED.

Mr. Foust's motion for summary judgment (ECF No. 41) is GRANTED.


DATED this 24th day of September, 2019.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge